UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

Case No.

2015 FORD EXPLORER SUV, VIN 1FM5K8D86FGB09895,

2013 FORD F-350 SUPER DUTY CREW PICKUP, VIN 1FT8W3BT3DEB07854,

2017 HARLEY DAVIDSON ELECTRA GLIDE MOTORCYCLE, VIN 1HD1KED10HB652677,

$8,647.41 IN FUNDS FROM HUNTINGTON BANK ACCOUNT ENDING 2096,

      Defendant Property.
_____/

## **VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

NOW COMES Plaintiff, United States of America, by and through its attorneys, Andrew Byerly Birge, United States Attorney for the Western District of Michigan, and Daniel T. McGraw, Assistant United States Attorney, and states upon information and belief that:

### NATURE OF THE ACTION

1. This is a civil forfeiture action filed pursuant to 18 U.S.C. § 981(a)(1)(C) and Supplemental Rule G(2) of the Federal Rules of Civil Procedure to forfeit and condemn to the use and benefit of the United States of America (1) a 2015 Ford

1

Explorer SUV, VIN 1FM5K8D86FGB09895; (2) a 2013 Ford F-350 Super Duty Crew Pickup, VIN 1FT8W3BT3DEB07854; (3) a 2017 Harley Davidson Electra Glide Motorcycle, VIN 1HD1KED10HB652677; and (4) $8,647.41 in funds from Huntington Bank Account ending 2096 (the "Defendant Property").

## THE DEFENDANT IN REM

2. The Defendant Property consists of (1) a 2015 Ford Explorer SUV, VIN 1FM5K8D86FGB09895; (2) a 2013 Ford F-350 Super Duty Crew Pickup, VIN 1FT8W3BT3DEB07854; (3) a 2017 Harley Davidson Electra Glide Motorcycle, VIN 1HD1KED10HB652677; and (4) $8,647.41 in funds from Huntington Bank Account 610262096, seized on or about December 2, 2021, by the United States Marshals Service (USMS) in South Boardman, Michigan, within the Western District of Michigan. The Defendant Property is currently in the custody of the USMS.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1345 and 1355(b)(1)(A) because this action is being commenced by the United States of America as plaintiff and the acts giving rise to the basis for forfeiture occurred in the Western District of Michigan.

4. Venue is proper before this Court pursuant to 28 U.S.C. § 1395(b), because the Defendant Property is located within the Western District of Michigan.

## BASIS FOR FORFEITURE

5. As set forth below, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes any

property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, including theft of public money, in violation of 18 U.S.C. § 641, and wire fraud, in violation of 18 U.S.C. § 1343.

6. Furthermore, when the subject property in a civil forfeiture action constitutes funds deposited in an account at a financial institution, under Title 18, United States Code, Section 984, any identical property found in the same account, regardless of whether it was the specific property involved in the offense, shall be subject to forfeiture, as long as the forfeiture action is commenced within one year from the date of the offense.

## FACTS SUPPORTING FORFEITURE

A. Background and Overview

7. In June 2020, the U.S. Attorney's Office for the Western District of Michigan and U.S. Health and Human Services, Office of the Inspector General (HHS OIG) began investigating TODD MARTIN KREYKES for theft of public funds and wire fraud, based on his misuse of Coronavirus Aid, Relief, and Economic Security (CARES) Act funding. KREYKES is a licensed physician assistant and owner of Boardman Family Practice, 4713 Pine Street SW, South Boardman, Michigan 49680 (BFP), which is a family practice.

8. Upon information and belief, KREYKES misused CARES Act program funding on personal expenditures, instead of using the program funding in accordance with program requirements. Specifically, KREYKES used CARES Act program funding to: buy a personal camper and metal enclosure to protect it; have

his house painted and kitchen remodeled; purchase a pickup truck; make payments on his wife's vehicle; book a personal vacation; make a payment for his son's wedding; and write a check to himself in the amount of $20,000.

9. Upon information and belief, the only pandemic-related purchase that KREYKES made using CARES Act program funding was for a plastic shield partition for the checkout window at the BFP Office.

10. The CARES Act provided billions of dollars in funding to existing businesses, including hospitals, health-care practices and providers, to combat the Coronavirus pandemic. The HHS Health Resources & Services Administration (HRSA) administered many of the CARES Act programs, including those referenced in this complaint.

11. This funding included the CARES Act Provider Relief Fund ("Provider Relief Fund"), which initially allocated $30 billion to health care providers through a general distribution in early 2020, and later allocated an additional $20 billion. The Provider Relief Fund allocated funds to health-care providers if they billed Medicare in 2019, were not presently excluded from the Medicare program, and provided diagnosis, testing, or care for individuals with possible or actual cases of COVID-19. In order to properly accept its allocation, the provider attested that the payment would only be used to prevent, prepare for, and respond to coronavirus, and that the payment would reimburse the recipient only for health care related expenses or lost revenues that are attributable to coronavirus. The relevant terms and conditions provided that non-compliance with any term or condition provided HRSA with a right

to recoup all or some of the payment. Additionally, the provider was required to maintain records of expenditures and to file reports detailing the receipt and use of all funds. Given the government's right of recoupment, the restrictive terms and conditions, and the report and record-keeping requirements, the funds remained the property of the government. *See United States v. Osborne*, 886 F.3d 604, 608-609 (6th Cir. 2017).

12. HHS, through HRSA, also distributed CARES Act funding pursuant to a program for Rural Health Clinics. Pursuant to the Rural Health Clinics Program, $225 million was allocated to support rural health clinics that participated in Medicare and Medicaid as of March 2020. Providers receiving these funds attested that the funding would be used for COVID-19 testing and related expenses, which may include, but are not limited to, planning for implementation of a COVID-19 testing program, procuring supplies to provide testing, training providers and staff on COVID-19 testing procedures, and reporting data to HHS on COVID-19 testing activities. Additionally, the funds could be used for building or construction of temporary structures, leasing of properties, and retrofitting facilities as necessary to support COVID-19. The terms and conditions of the Rural Health Clinics program included a right of recoupment, restrictions on use of the funds, and record-keeping and reporting requirements.

13. The CARES Act also included claims reimbursement for health-care providers that provided testing, care, and treatment to uninsured individuals with COVID-19 pursuant to the HRSA COVID-19 Uninsured Program. Pursuant to the

5

Uninsured Program, health-care providers that conducted COVID-19 testing or treatment for uninsured individuals with COVID-19 primary diagnosis on or after February 4, 2020, could request claims reimbursement and be reimbursed generally at Medicare rates.

14. The three programs discussed above are generally referred to in this complaint as "the CARES Act programs."

B. **KREYKES' Receipt of CARES Act Program Funds for BFP and Attestation**

15. Records obtained from HRSA show that in April 2020, HRSA communicated with BFP through an email assigned to M.K., a BFP medical assistant and office manager, about a distribution to BFP from the first $30 billion in CARES Act funding pursuant to the Provider Relief Fund. On or about April 10, 2020, HRSA paid BFP $2,544.88 through the Provider Relief Fund. Records from HRSA further show that on or about April 20, 2020, an individual using the email toddkreykes@hotmail.com attested to the terms attached to the receipt of those funds, which as explained above, generally required the funds to be used to care and treat patients with COVID-19 or otherwise to prevent, prepare for, and respond to coronavirus, and that the payment would reimburse the recipient only for health care related expenses or lost revenues that are attributable to coronavirus.

16. Records from HRSA also show that in May 2020, HRSA again communicated with BFP through an email assigned to M.K., about a second distribution from the Provider Relief Act. On or about May 6, 2020, HRSA paid BFP $113,690.71 through the Provider Relief Act. Records from HRSA further show that

on or about May 15, 2020, an individual using the email toddkreykes@hotmail.com attested to the terms attached to the receipt of those funds which, as explained above, generally required the funds to be used to care and treat patients with COVID-19 or otherwise to prevent, prepare for, and respond to coronavirus, and that the payment would reimburse the recipient only for health care related expenses or lost revenues that are attributable to coronavirus.

17. Records obtained from HRSA show that in May 2020, HRSA again communicated with BFP through an email assigned to M.K., about a distribution through the Rural Health Center Testing Program. On or about May 20, 2020, HRSA paid BFP $49,461.42 through the Rural Health Center Testing Program. Records from HRSA further show that on or about May 29, 2020, an individual using the email toddkreykes@hotmail.com attested to the terms attached to the receipt of those funds which, as explained above, required the funds to be used for planning for implementation of a COVID-19 testing program, procuring supplies to provide testing, training providers and staff on COVID-19 testing procedures, or expenditures related to building or preparing facilities for COVID-19 testing.

18. According to records from HRSA, HRSA communicated with BFP through an email assigned to M.K., about the HRSA COVID-19 Uninsured Program. On or about May 23, 2020, HRSA paid BFP $4,148.58 through this program. Records from HRSA further show that on or about June 3, 2020, an individual using the email toddkreykes@hotmail.com attested to the terms attached to the receipt of those funds.

19. Finally, an email to boardmanhealth@hotmail.com announcing an additional payment through the Rural Health Center program resulted in a payment to BFP on June 10, 2021 in the amount of $100,000.00. KREYKES did not formally attest to this amount, but instead under the terms of the program, he allowed 90 days to elapse after receipt of the money and thereby accepted the program terms and conditions.

20. Upon information and belief, the email address toddkreykes@hotmail.com belonged to KREYKES, and no one in the BFP office had access to that account but KREYKES.

21. Upon information and belief, KREYKES was the individual who attested to the terms of the CARES Act program payments.

C. KREYKES Spent the CARES Act Program Payments Received by BFP on Personal Items and Expenditures and Did Not Use the Funds for the Purposes Specified in the Program Terms.

22. Upon information and belief, KREYKES spent the CARES Act Program payments received by BFP on personal items and expenditures, and did not use the funds for the purposes specified in the program terms, in both 2020 and 2021, as detailed below.

*2020 Payments Received and Personal Expenses Paid*

23. Upon information and belief, the following CARES Act program payments from 2020 were received into the BFP business checking account at Huntington Bank, account number ending 2096, on the following dates:

    a. $2,544.88 received in BFP account on April 10, 2020;

    b. $113,690.71 received in BFP account on May 6, 2020;

8

  c. $49,461.42 received in BFP account on May 20, 2020; and

  d. $4,148.58 received in BFP account on May 26, 2020.

In all, between April 10, 2020 and May 26, 2020, **$169,845.59** in CARES Act program payments was received in the BFP business checking account.

 24. On April 9, 2020, just before BFP received the first CARES Act program payment, the balance in the BFP account was $11,538.93.

 25. Between April 10, 2020 and January 31, 2021, KREYKES used the funds in the BFP business checking account for the following items and expenditures, among others, that did not comply with the terms and conditions of the CARES Act programs described above, because they did not relate to the care and testing of patients with COVID-19 or preparation for dealing with the coronavirus pandemic, but instead were expenditures on travel, personal vehicles, and other personal items solely for the benefit of KREYKES:

| Date | Description | Amount |
| --- | --- | --- |
| 4/27/2020 | Westgate Cruise & Travel 8668685089 AZ | $1,296.00 |
| 5/12/2020 | Payoff BFP PLLC Business Loan #57209459 | $61,175.97 |
| 5/18/2020 | Cash Withdrawal | $15,400.00 |
| 5/21/2020 | Payoff Loan #971319751, 2015 Ford Explorer | $16,716.68 |
| 5/21/2020 | Check #3178 payable to Todd Kreykes | $25,000.00 |
| 6/2/2020 | Vacation Rental VRBO HA6CM8MX | $1,030.65 |
| 6/7/2020 | Check #3185 Payable to Steve Schrader<br>Memo line: "painting" | $2,500.00 |
| 6/9/2020 | Check #3183 Payable to Cody Schaub<br>Memo line: "40% kitchen" (Kreykes' kitchen remodel) | $2,750.00 |
| 6/15/2020 | Check #3186 Payable to All Steel Carports (ASC)<br>Memo line: "shelter" (carport at Kreykes' residence) | $3,791.30 |
| 6/29/2020 | Check #3194 Payable to Schaub Construction<br>Payment #2 re: kitchen remodel | $4,694.00 |
| 7/23/2020 | Purchase of Cashier's check – Bill Marsh | $20,005.00 |

|  | Automotive – down-payment- 2013 Ford F-350 Pickup truck |  |
|---|---|---|
| 9/8/2020 | Check #2763 Payable to Luke Kreykes Memo line: "Congrats!" (wedding gift) | $5,000.00 |
| 9/25/2020 | Westgate Cruise Travel 866 868 5 AZ | $1,602.00 |
| 12/29/2020 | Allegiant Travel 702 505 8 NV | $1,337.00 |
| 12/31/2020 | Disney Resorts WDTC 407828563 FL | $2,079.80 |
| 1/7/2021 | VRBO HALNB36S 512 759 0 TX | $1,495.70 |
|  | **Total** | **$165,874.10** |

26. During the same time period, April 9, 2020 to January 31, 2021, the BFP account received $237,067.32 in deposits, and a Small Business Administration (SBA) credit of $33,335.17, for a total of $270,402.49 from sources other than the CARES Act program payments. A review of the deposits totaling $237,067.32 revealed that they are payments from insurance companies, patients, and government insurance programs to BFP (from sources unrelated to the CARES Act programs). No deposits were identified as being loans, gifts, or contributions of capital to BFP. During the same time period, April 9, 2020 to January 31, 2021, the BFP account paid out $273,677.55 in business expenses including payroll, KREYKES' salary, payroll taxes, utilities, business taxes, and office supplies. The above figures show that BFP's business revenues were exhausted by its business expenses and during the relevant time period BFP's business did not have profits available for expenditures on personal items and expenses. As a result, KREYKES used a substantial amount of the CARES Act program payments on the personal items and expenditures totaling $165,874.10, as outlined in the table above.

27. The table below summarizes the funds in (deposits) and funds out (withdrawals) from the BFP business checking account during the time period April

9, 2020 to January 31, 2021. This table further demonstrates that KREYKES would not have been able to pay for the personal items and expenses in the amount of $165,874.10 without the CARES ACT program payments:

|  | Funds In | Funds Out |
|---|---|---|
| 4 CARES Act Payments | $ 169,845.59 |  |
| Personal Items & Expenses |  | $ 165,874.10 |
| SBA Credit | $ 33,335.17 |  |
| BFP Revenue | $ 237,067.32 |  |
| Business Expenses |  | $273,677.55 |
| Totals | $440,248.08 | $ 439,551.65 |

28. Given that KREYKES did not have sufficient revenue from BFP to cover the $165,874.10 in personal expenditures, KREYKES paid for these items and expenditures with the four CARES Act payments received during the same time period.

29. Upon information and belief, KREYKES purchased the 2015 Ford Explorer on January 3, 2018 for $28,427.46, with an initial down payment of $5,000, and financed the remaining $26,284.46 through TCF Bank loan #971319751. KREYKES paid off this loan in the amount of $16,716.68 on May 21, 2020 after receiving the second CARES Act program payment of $113,690.71 on May 6, 2020, and the third CARES Act program payment of $49,461.42 on May 20, 2020.

30. According to Michigan Secretary of State records, the 2015 Ford Explorer is registered in KREYKES' name at his residence in South Boardman, Michigan, with Michigan registration number KB78P.

31. Upon information and belief, KREYKES purchased the 2013 Ford F-350 on July 23, 2020 for $36,500 and made a down payment of $20,000 using a Cashier's

Check from the BFP business checking account. KREYKES subsequently made monthly payments of $459 on the remainder of the loan from his personal checking account.

32. According to Michigan Secretary of State records, the 2013 Ford F-350 is registered in KREYKES' name at KREYKES' residence, with Michigan registration number EGV3466.

33. Upon information and belief, the 2015 Ford Explorer and 2013 F-350 Pickup truck constitute any property, real or personal, which constitutes or is derived from proceeds traceable to theft of public money, in violation of 18 U.S.C. § 641, or wire fraud, in violation of 18 U.S.C. § 1343, and are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C).

*2021 Payments Received and Personal Expenses Paid*

34. Upon information and belief, a $100,000 CARES Act program payment was received into the BFP business checking account at Huntington Bank, account number ending 2096, on June 10, 2021. Between February 1, 2021 and September 30, 2021, a total of **$100,000** in CARES Act program payments was received in the BFP business checking account.

35. On June 10, 2021, just before the BFP business checking account received the $100,000 CARES Act program payment, the balance in the BFP account was $18,836.64.

36. Between June 10, 2021 and September 30, 2021, KREYKES used the funds in the BFP business checking account for the following items and expenditures,

12

among others, that did not comply with the terms and conditions of the CARES Act programs described above, because they did not relate to the care and testing of patients with COVID-19 or preparation for dealing with the coronavirus pandemic, but instead were expenditures on travel, personal vehicles, and other personal items solely for the benefit of KREYKES. Specifically, this $100,000 payment was made through the Rural Health Center program, which like the $49,461.42 payment received on May 20, 2020 (described above), was a targeted payment to assist rural health centers, and was restricted entirely to expenditures related to the care and treatment of patients with coronavirus or the improvement of facilities used to treat coronavirus and could not be used to replace lost revenues.

| Date | Description | Amount |
|---|---|---|
| 6/15/2021 | Elmer's Crane and Dozer, Clover Co MI | $6,920.00 |
| 6/17/2021 | Cash Withdrawal | $10,200.00 |
| 6/25/2021 | Check #2823 Miller's US 31 Sales – Used and Preowned Motorcycles (2017 Harley Davidson) | $20,024.00 |
| 7/8/2021 | Expedia Travel | $1,066.49 |
| 7/8/2021 | Westgate Resort HOA FL | $1,843.30 |
| 7/9/2021 | American Air Fort Worth TX | $341.81 |
| 7/9/2021 | American Air Fort Worth TX | $156.26 |
| 7/9/2021 | American Air Fort Worth TX | $156.26 |
| 7/9/2021 | American Air Fort Worth TX | $341.81 |
| 7/12/2021 | Kiss Carpet Design Center 231 58794 MI | $5,000.00 |
| 7/13/2021 | Peter Colombo Northwoods Contracting LLC | $3,000.00 |
| 7/22/2021 | Northwoods Contracting | $3,359.84 |
| 9/7/2021 | BestBuyCom | $2,117.88 |
| 9/10/2021 | Mid Michigan Barns Evart, MI | $8,226.66 |
| | **Total** | **$62,754.31** |

37. During the same time period, June 10, 2021 through September 30, 2021, the BFP business checking account received $73,149.78 in deposits from sources other than CARES Act program payments. A review of the deposits totaling

$73,149.78 revealed that they are payments from insurance companies and government insurance programs to BFP, and regular monthly deposits that appear to be payments from patients (from sources unrelated to the CARES Act programs). No deposits were identified as being loans, gifts, or contributions of capital to BFP. During the same time period, June 10, 2021 to September 30, 2021, the BFP business checking account paid out $108,807.76 in business expenses including payroll, KREYKES' salary, payroll taxes, utilities, business taxes, and office supplies. The above figures show that BFP's business revenues were exhausted by its business expenses and during the relevant time period BFP's business did not have profits available for expenditures on personal items and expenses.

38. The table below summarizes the funds in (deposits) and funds out (withdrawals) from the BFP business checking account during the time period June 10, 2021 to September 30, 2021. This table further demonstrates that KREYKES paid for personal items and expenses in the amount of $62,754.31:

|  | Funds In | Funds Out |
|---|---|---|
| CARES Act Payment | $ 100,000.00 |  |
| Personal Items & Expenses |  | $ 62,754.31 |
| BFP Revenue | $ 73,149.78 |  |
| Business Expenses |  | $ 108,807.76 |
| Totals | $ 173,149.78 | $ 171,562.07 |

39. Upon information and belief, on June 25, 2021, KREYKES paid $20,024.00 towards the 2017 Harley Davidson motorcycle. Excluding that payment, KREYKES paid at least $42,730.31 from the BFP business checking account on personal expenditures including vacations, air travel, and contractors for home improvements, as shown in the chart above.

40. According to Michigan Secretary of State records, the 2017 Harley Davidson is registered in KREYKES' name at KREYKES' residence, with Michigan registration number SQ380. The 2017 Harley Davidson was first registered on June 28, 2021, three days after KREYKES purchased it.

41. Upon information and belief, the 2017 Harley Davidson motorcycle constitutes any property, real or personal, which constitutes or is derived from proceeds traceable to theft of public money, in violation of 18 U.S.C. § 641, or wire fraud, in violation of 18 U.S.C. § 1343, and is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C).

42. Moreover, upon information and belief, the $42,730.31 in additional payments from the BFP business checking account on personal expenditures constitutes any property, real or personal, which constitutes or is derived from proceeds traceable to theft of public money, in violation of 18 U.S.C. § 641, or wire fraud, in violation of 18 U.S.C. § 1343, and is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C).

43. Pursuant to 18 U.S.C. § 984, in any forfeiture action in rem in which the subject property is funds deposited in an account in a financial institution, it shall not be necessary for the government to identify the specific property involved in the offense that is the basis for forfeiture, and it shall not be a defense that the property involved in the offense has been removed and replaced by identical property. As long as the forfeiture action is commenced within one year from the date of the offense, any identical property found in the same account as the property involved in the

offense that is the basis for forfeiture shall be subject to forfeiture under 18 U.S.C. § 984 ("the fungibility statute"). Accordingly, even though KREYKES spent the $42,730.31 on personal expenditures, an amount up to $42,730.31 that was still in the BFP account was subject to seizure and forfeiture under the statutes described above as proceeds of theft of public money or wire fraud.

44.     On or about December 2, 2021, the USMS executed a seizure warrant on the BFP business checking account, which authorized it to seize funds up to $42,730.31. Ultimately, only $8,647.41 in funds were seized from the BFP business checking account, Huntington Bank Account ending 2096, which constitutes any property, real or personal, which constitutes or is derived from proceeds traceable to theft of public money, in violation of 18 U.S.C. § 641, or wire fraud, in violation of 18 U.S.C. § 1343, and is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C).

## CLAIM I
**(Forfeiture of Proceeds Traceable to Theft of Public Money)**

45. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs numbered 1 through 44, as referenced above.

46. The Defendant Property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 641.

## CLAIM II
**(Forfeiture of Proceeds Traceable to Wire Fraud)**

47. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs numbered 1 through 44, as referenced above.

48. The Defendant Property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343.

## RELIEF

Wherefore, the United States prays that the usual process for forfeiture issue against the Defendant Property; that due notice be given to all interested parties to appear and show cause why forfeiture to the United States of America should not be decreed; and that the Defendant Property be condemned and forfeited to the United States of America and be delivered into the custody of the United States Marshal's Service for disposition according to law; and for such other relief as this Court may deem just and proper.

                                        ANDREW BYERLY BIRGE
                                        United States Attorney

Dated: April 27, 2022

DANIEL T. McGRAW
Assistant United States Attorney
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404

18

## VERIFICATION

I am a Deputy United States Marshal with the United States Marshals Service, and I am one of the federal investigators involved in the investigation described herein.

I have read the contents of the foregoing Verified Complaint for Forfeiture *In Rem* and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 27, 2022

JESSE LAKE
Deputy United States Marshal
United States Marshals Service